IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SWAYSEY RANKIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 16-CV-3138 |
| | ) | |
| DR. BAKER, | ) | |
| JEFF KORTE, | ) | |
| WEXFORD HEALTH SOURCES, | ) | |
| INC., and JOHN R. BALDWIN, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

**JAMES E. SHADID, U.S. District Judge.**

Plaintiff, proceeding pro se, claims that he was delayed treatment for his folliculitis, knee pain, and nasal congestion at Western Illinois Correctional Center (Western), conditions which Plaintiff had received treatment for at Stateville Correctional Center before his transfer to Western.  Plaintiff contends that Defendants knew that he had tried repeatedly to sign up for sick call at Western to no avail and did nothing to ensure Plaintiff's access to sick call.

Defendants move for summary judgment, to which Plaintiff has responded.  The Wexford Defendants still have time to file a reply, but a reply is not necessary.  Construing all inferences in

Plaintiff's favor, summary judgment must still be granted to
Defendants.  The procedure for seeking medical treatment for
Plaintiff's conditions, all of which were non-urgent, was to sign up
for sick call.  Plaintiff's vague assertions that unidentified officers
refused or failed to sign Plaintiff up for sick call is not enough at
this stage to show an actual problem with the sick call process or to
show that Defendants were personally aware of an actual problem.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).   A movant may demonstrate the absence of a material
dispute through specific cites to admissible evidence, or by showing
that the nonmovant "cannot produce admissible evidence to
support the [material]  fact."  Fed. R. Civ. P. 56(c)(B).  If the movant
clears this hurdle, the nonmovant may not simply rest on his or her
allegations in the complaint, but instead must point to admissible
evidence in the record to show that a genuine dispute exists.  Id.;
Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011).
"In a § 1983 case, the plaintiff bears the burden of proof on the

constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." <u>McAllister v. Price</u>, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, the evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. <u>Id.</u>

## Facts

Plaintiff was incarcerated in the Stateville Correctional Center before Plaintiff's transfer to Western in February 2015. In Stateville, Plaintiff was treated for folliculitis, chronic knee pain, and nasal congestion/allergies. For example, in August 2014, Plaintiff was prescribed an ice permit, knee sleeve, Naprosyn, and a low bunk for complaints of right knee pain, caused by an old basketball injury and knee surgery in 2008. (8/22/14 Stateville Progress Note, d/e 53; 8/28/14 Transfer Summary, d/e 53; Pl.'s Dep. 28-29.) Also in August 2014, Plaintiff was prescribed

Loratadine, a substitute for Claritin, for complaints of nasal congestion, as well as triamcinolone ointment, benzoyl peroxide gel, and T/Gel shampoo for a recurrent scalp condition that caused "painful . . . blisters, nodules, and lesions . . . ." (Stateville Med. Admin. Record, Sept. 2014, d/e 53, p. 17; Am. Compl. ¶ 9; Pl.'s Dep. 32.) According to Defendant Dr. Baker, Plaintiff's scalp condition is called folliculitis, "an inflammation of the hair follicles that can be caused by bacteria, yeast, or other types of fungus." (Dr. Baker Aff. ¶ 10.) The severity can range from mild to severe. Id. Plaintiff had from time to time received oral antibiotics during flare-ups of his folliculitis at Stateville. (Pl.'s Dep. 32-33.)

Plaintiff was transferred from Stateville to Western in February 2015. His T/Gel shampoo and ointment, per procedure, were taken out of Plaintiff's property box on transfer, and he did not receive replacements. (Pl.'s Dep. 33.) Plaintiff's transfer summary listed Plaintiff's hypertension as a chronic condition and Plaintiff's long-term medicines as hydrochlorothiazide (for Plaintiff's high blood pressure) and Claritin (for Plaintiff's nasal congestion). Plaintiff's knee pain and folliculitis were not listed as conditions. (2/25/15 Transfer Summary, d/e 59-7.) Labs were ordered, and Plaintiff was

placed on the chronic hypertension clinic. Plaintiff continued to receive his high blood pressure medicine after his transfer to Western and received a 30-day supply of Claritin. Plaintiff's understanding from discussions with unnamed medical staff on intake was that Plaintiff would be seen by a doctor in 3-4 days about Plaintiff's three medical problems—knee pain, folliculitis, and nasal congestion. (Pl.'s Dep. 38; Pl. Aff., d/e 53, p. 33.)

Plaintiff contends that prior transfer summaries did list Plaintiff's scalp and knee problems. (10/6/14 transfer summary, d/e 63-2; 2/16/13 transfer summary, d/e 59-3, p. 9.)[1] However, Plaintiff does not dispute that the transfer summary for Plaintiff's transfer to Western did not list these problems.

On March 9, 2015, Defendant Dr. Baker, then the Medical Director at Western, saw Plaintiff at the hypertension clinic. Plaintiff contends that he asked Dr. Baker to treat Plaintiff's folliculitis, knee pain, and nasal congestion by continuing the treatments Plaintiff had received in Stateville. Plaintiff maintains

---

[1] Plaintiff contends that just one month before he saw Dr. Baker in 2015 a transfer summary stated that Plaintiff had open sores and wounds on his scalp. Plaintiff's cite, though, refers to a transfer summary dated 2/16/2013, two years before Plaintiff saw Dr. Baker. In any event, the Court is assuming that Plaintiff's scalp condition needed treatment. The question in this case is whether Defendants acted reasonably in relying on the sick call procedure to address that condition.

that he told Dr. Baker that he was in "pain, unbearable pain to the point where I'm unable to sleep as well as I would like to" and that he could not "even lay my head a certain way because the folliculitis had swollen up so bad." (Pl.'s Dep. 39.) Plaintiff also contends that he was noticeably limping and told Dr. Baker of excruciating pain in Plaintiff's knee, as well as sneezing and coughing up blood due to his nasal congestion. (Am. Compl. ¶¶ 31-32.)

According to Plaintiff, Dr. Baker responded that only Plaintiff's hypertension would be addressed at this visit, (Pl.'s Dep. 38), which is consistent with Dr. Baker's averment that he generally addresses only a patient's hypertension at the hypertension clinic, unless a patient has an emergent medical need. (Dr. Baker's Aff. ¶ 9.) Dr. Baker, according to Plaintiff, told Plaintiff to sign up for sick call. (Pl.'s Dep. 50.)

Dr. Baker maintains that Plaintiff did not complain of other medical problems at the hypertension clinic but that, in any event, Plaintiff's folliculitis, knee pain, and nasal congestion were not urgent issues and could have been appropriately treated through sick call. (Dr. Baker's Aff. ¶¶ 7, 10.) Dr. Baker avers that inmates can sign up for sick call in their housing units, which is conducted

daily.  (Dr. Baker Aff. ¶ 8.)  Dr. Baker does not explain exactly how an inmate signs up for sick call, but, according to Plaintiff, an inmate asks an officer to put the inmate's name on the sick call list, and the officer adds that inmate's name to a list kept on a clip board in the foyer or control room.  (Pl.'s Dep. 26.)  A nurse then sees patients at sick call and refers them to the doctor if necessary.  (Korte Ans. Interr. 8, d/e 44-4, p. 5.)  Plaintiff contends that sometimes officers forget to sign an inmate up for sick call, and that the medical staff have up to 72 hours to see an inmate after he is signed up for sick call.  (Pl.'s Dec. ¶ 3., d/e 63-2, p. 5.)  According to a response to one of Plaintiff's grievances, a $5.00 copay is required to see the nurse at sick call, but no fee is charged for visits to the chronic hypertension clinic.  (d/e 1, p. 9.)  Plaintiff contends that he told Dr. Baker at the March 9 visit that he had tried three times to sign up for sick call without success.  (Pl.'s Dec. ¶ 9, d/e 63-2, p. 5.)

The March 9 visit at the hypertension clinic was Dr. Baker's first and last time he examined Plaintiff.  Plaintiff contends that Dr. Baker did later consult with Plaintiff about hypertension issues, but Plaintiff cites only a paragraph in Plaintiff's affidavit which states

that Dr. Baker told Plaintiff to put in for sick call. (Pl.'s Dec. ¶ 8, d/e 63-2, p. 5.)

Plaintiff contends that for months—from March to September 2015— he repeatedly asked officers on his housing unit to sign him up for sick call and also dropped notes in the medication refill box on the housing unit. (Pl.'s Dep. 23-24, 26, 40-41.) Plaintiff maintains that at times officers said Plaintiff would be put on the list when Plaintiff showed his identification card and was wearing his "state-issued blues," which Plaintiff did not understand. (Pl.'s Dep. 44.) Whether an identification card and certain attire is necessary to sign up for sick call is not explained. Plaintiff also maintains that, after filing grievances, he wrote Dr. Baker several letters asking to be placed on sick call and for medical help. (Pl.'s Dec. ¶ 12, d/e 63-2, p. 5.)

In addition to trying to sign up for sick call, Plaintiff filed grievances in March, April, May, and June, complaining about his problems signing up for sick call. (Pl.'s Grievances, d/e 53, pp. 26-32.). Plaintiff also complained in the grievances about Dr. Baker's refusal to treat Plaintiff for anything other than hypertension at the hypertension clinic on March 9. Plaintiff asked for a change in the

sick call protocol to require doctors to treat inmates for all medical problems (presumably at the chronic care clinics) without requiring a co-pay. (d/e 53, p. 26.) Plaintiff received no responses at all to some of his grievances, (Pl.'s Dep. 48), but the responses he did receive instructed Plaintiff to sign up for sick call, reported that Plaintiff's chart showed no record of any attempt to sign up for sick call, and told Plaintiff that the sick call co-pay was required by State law. (d/e 1, p. 9; d/e 53, p. 31; d/e 1, p. 14) One response told Plaintiff that he could sign up for nurse sick call with the foyer officer and that Plaintiff must be properly dressed upon entering the foyer. (d/e 1 p. 12.)

Defendants offer in support of their motion all the daily sick call sign-up sheets from Plaintiff's housing units during the relevant times. (Sick Call Logs attached to d/e 59 and filed under seal at d/e 62 with unredacted names.) There are over 200 pages, most of them listing several inmates who were signed up for sick call each day, along with a staff member name, apparently of the staff member who signed up the inmate, though that is not explained. There is also a column titled "disposition," which appears to be completed by the health care staff. What is clear is that Plaintiff's

name is not on any of these lists, and Defendants have no record that Plaintiff actually requested to be placed on the sick call list during this time period.

Plaintiff maintains that on one occasion he spoke to Defendant Korte (the Warden), and showed Warden Korte the blood and puss on Plaintiff's pillow from Plaintiff's folliculitis. According to Plaintiff, Warden Korte said he "would look into it," but nothing happened. (Pl.'s Aff., d/e 53, p. 33.) Plaintiff says he spoke directly to Defendant Korte on other occasions, telling Defendant Korte about Plaintiff's unavailing requests to go to sick call. According to Plaintiff, Defendant Korte assured Plaintiff that he would be called for sick call. (Pl.'s Dep. 22.) Plaintiff also wrote a letter to Defendant Baldwin, the IDOC Director, but received no response. (Pl.'s Aff., d/e 53, p. 33.) Plaintiff offers the affidavits of several inmates who observed bumps on Plaintiff's head discharging pus and blood, saw Plaintiff limping, and heard Warden Korte say he would look into it. (Pl.'s Aff., d/e 53, pp. 34-37.) Defendant Korte does not recall speaking with Plaintiff but acknowledges that it is possible. (Korte Answer Interr. 23, d/e 44-4, p. 20.)

On September 8, 2015, Dr. Baker stopped working as the Medical Director of Western. About two weeks later, on September 24, 2015, a nurse practitioner prescribed T/Gel shampoo and triamcinolone ointment[2] to Plaintiff, which helped Plaintiff's folliculitis. (9/24/15 Medical Progress Note, d/e 59-14, p. 11; Pl.'s Dep. 35.) The parties do not explain how Plaintiff came to see a nurse practitioner on September 24, but it appears that Plaintiff saw the nurse practitioner at the chronic hypertension clinic. Unlike Dr. Baker, then, the nurse practitioner apparently did agree to treat Plaintiff for something other than his hypertension at the hypertension clinic. Plaintiff appeared to be in segregation on this date, so perhaps that made a difference in the conditions the nurse practitioner decided to treat. Later, on some unidentified date after Plaintiff's visit with the nurse practitioner, Dr. Butler, who is not a Defendant, prescribed Ibuprofen, which helped the pain in Plaintiff's knee and on his scalp. (October 2015 Medication Administration Record, d/e 59-19, p. 2.) Plaintiff had not bought Tylenol or Ibuprofen at the commissary because the dosage

---

[2] According to webmd.com, triamcinolone acetonide cream is a corticosteroid used to treat a variety of skin conditions. (www.webmd.com, last visited 2/28/

available at the commissary was not strong enough to reduce the pain.  (Pl.'s Dep. 35-36.)  Plaintiff also received a prescription for Claritin on or around November 3, 2015, to address Plaintiff's complaints of nasal congestion.  (November 2015 Medication Administration Record, d/e 59-19, p. 3.)

## Analysis

Deliberate indifference to a serious medical need violates an inmate's Eighth Amendment right to be free from cruel and unusual punishment.  The medical need must be objectively serious, and Defendants must be deliberately indifferent to that need.  Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014).

Defendants argue that Plaintiff's medical needs were not objectively serious.  The Court agrees as to Plaintiff's nasal congestion—which Plaintiff described as not being able to breathe out of one of his nostrils from time to time.  (Pl.'s Dep. 30.)  *See* Gutierrez v. Peters, 111 F.3d 1364 (7th Cir. 1997)(not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim.")  No evidence suggests that Plaintiff's ability to function was hampered in any significant way because of his nasal congestion, or that the

congestion caused chronic and substantial pain. That other medical professionals prescribed Plaintiff with Claritin does not transform Plaintiff's nasal congestion into an objectively serious medical need. Plaintiff now believes that his nasal condition was related to sleep apnea, which was purportedly diagnosed after Plaintiff filed this case, (Pl.'s Dep. 30), but sleep apnea is not a claim in this case.

Plaintiff's folliculitis and knee pain warrant a different conclusion. Drawing inferences in Plaintiff's favor, his knee pain arguably amounted to a serious medical condition, even though the pain was treatable with an over-the-counter medicine. *See* <u>Diaz v. Godinez</u>, 693 F'Appx. 440 (7th Cir. 2017)(not published in F.Rptr.)("[T]urning a blind eye to a prisoner's complaints of readily treatable pain can constitute an Eighth Amendment violation, even if the condition is not life–threatening and the failure to treat does not exacerbate the condition."). Plaintiff says his knee pain was "excruciating" and made him limp—a rational juror might find that kind of pain is a serious medical need. With regard to Plaintiff's folliculitis, a rational juror could find that painful bumps on the scalp draining pus and blood is a serious medical need. Folliculitis

can range from mild to severe in Dr. Baker's own words.  Accepting Plaintiff's description, his folliculitis at the time arguable fell on the latter side.[3]

No rational juror could find, though, that Defendants were deliberately indifferent.  Deliberate indifference is the conscious disregard of a known, serious medical need.  *See* <u>Petties v. Carter</u>, 836 F.3d 722 (2016).

Defendants Wexford Health Sources, Inc. (Wexford), and John Baldwin, the IDOC Director, can be disposed of quickly.  Wexford can be liable only if its policy or practice caused the lack of medical care, and there is no evidence of that here.  *See* <u>Woodward v. Correctional Medical Services of Illinois, Inc.</u>, 368 F.3d 917 (7th Cir. 2004)(corporate practice or policy must be moving force behind constitutional violation).  Wexford is not liable solely because it employs Dr. Baker.  <u>Collins v. Al-Shami</u>, 851 F.3d 727, 734 (7th Cir. 2017)("Under existing precedent, neither public nor private entities may be held vicariously liable under § 1983.")  As to

---

[3] Plaintiff asserts that his scalp condition was diagnosed as a serious condition in 2009 and 2011, and also in a case he pursued in the Northern District of Illinois in 2011.  Plaintiff also points to 2013 medical records showing treatment for Plaintiff's scalp condition.  Plaintiff's scalp condition in 2009, 2011, and 2013, do not show his condition in February 2015.  In any event, the Court is assuming Plaintiff's scalp condition was a serious medical need.

Defendant Baldwin, the IDOC Director, Plaintiff's letter to Baldwin in September 2015 is not enough to find Defendant Baldwin personally responsible for the alleged lack of medical attention. Defendant Baldwin is not liable solely because he is in charge. Matthews v. City of East St. Louis, 675 F.3d 703, 708 (7th Cir. 2012)("To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'")(quoted cite omitted); Soderbeck v. Burnett County, 752 F.2d 285, 293 (7th Cir. 1985)("Failure to take corrective action cannot in and of itself violate section 1983. Otherwise the action of an inferior officer would automatically be attributed up the line to his highest superior . . . .").

Defendants Dr. Baker and Warden Korte require more discussion but with the same conclusion.

Dr. Baker saw Plaintiff only once, a few weeks after Plaintiff transferred to Pontiac. No evidence suggests that Dr. Baker's determination that Plaintiff's medical needs could wait for Plaintiff to visit sick call was outside the range of acceptable professional approaches. Roe v. Elyea, 631 F.3d 843, 857 (7th Cir.

2011)(deliberate indifference arises "'if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'")(*quoting* Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2009). Plaintiff's disagreement with Dr. Baker's assessment is not enough to infer deliberate indifference. Pyles v. Fahim, 771 F.3d 403, 410 (7th Cir. 2014)("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). Additionally, Dr. Baker's general approach to addressing only hypertension issues at the hypertension clinic is not deliberate indifference. That a different medical provider chose to address Plaintiff's folliculitis at the next hypertension clinic six months later also does not allow an inference of deliberate indifference against Dr. Baker.

The crux of this case is Plaintiff's claim that he repeatedly tried to sign up for sick call to no avail. Intentionally denying an inmate access to medical care may arise to deliberate indifference. Petties v. Carter, 836 F.3d 722 n.1 (7th Cir. 2016). However, the

officers responsible for signing Plaintiff up for sick call would be the ones liable for failing or refusing to do so, not the named Defendants in this case. Plaintiff does not identify any of those officers, nor does he share any specifics about the dates or circumstances under which he tried to sign up for sick call. Plaintiff's grievances, in addition to mentioning his vague efforts to sign up for sick call, complained of Dr. Baker's handling of the March 9 visit, having to go to sick call at all, the co-pay requirement for sick call, and being told he must wear his "state issued blues" in the foyer to sign up for sick call. (d/e 1, pp. 11, 13, 16, 18.) One gets the sense that this case is more about Dr. Baker's refusal to consider Plaintiff's other medical problems at the free hypertension clinic rather than Plaintiff's ability to sign up for sick call. Plaintiff has the burden of proving his case—vague allegations that he tried to sign up for sick call are not enough at this stage.

Even if unidentified officers did refuse or fail to sign Plaintiff up for sick call for months, that would not be enough to impute liability to Dr. Baker or Warden Korte. Dr. Baker and Warden Korte must have *actually known* that officers were refusing or failing to sign Plaintiff up for sick call. Plaintiff's vague say-so is not enough

in light of the evidence that the sick call process was working as designed. It is undisputed that inmates could sign up for sick call on the housing units. The sick call logs bear that out—inmates on Plaintiff's unit signed up nearly every day. To anyone who looked into the matter, the sick call process would have appeared to be working properly, which is the implicit conclusion in the grievance responses approved by Warden Korte. Warden Korte's purported statements that he would look into it and assurance that Plaintiff be called for sick call list does not change that conclusion. Plaintiff has no evidence that these purported statements meant that Warden Korte would himself place Plaintiff on the sick call list or simply ensure that the sick call procedures were working and available to Plaintiff. In short, there is just not enough here for a rational juror to find that Dr. Baker or Warden Korte acted unreasonably in relying on the sick call procedure to address Plaintiff's medical complaints.

**IT IS THEREFORE ORDERED:**

1. The second motion for an extension of the dispositive motion by Defendants Baker, et al., is denied as moot (d/e 52) because the third motion for an extension was granted.

2. Defendants' motions for summary judgment are granted. (d/e's 43, 59.) The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. All other pending motions, if any, are denied as moot, and this case is closed, with the parties to bear their own costs. All deadlines and settings on the Court's calendar are vacated, including the jury trial set for May 1, 2018.

3. If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis should identify the issues Plaintiff will present on appeal. See Fed. R. App. P. 24(a)(1)(c). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTER: 3/7/2018
FOR THE COURT:

<u>**s/James E. Shadid**</u>
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE